## HOTEL SECURITY CHECKING CO. v. LORRAINE CO.

(Circuit Court of Appeals, Second Circuit. March 10, 1908.)

No. 164.

1. PATENTS—SUBJECTS OF PATENTS—"ART."
   A system of transacting business, disconnected from the means for carrying out the system is not, within the most liberal interpretation of the term, an "art," and, unless the means used are novel and disclose invention, such system is not patentable.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 6.
   For other definitions, see Words and Phrases, vol. 1, pp. 510, 511.]

2. SAME—INVENTION—METHOD AND MEANS OF ACCOUNT CHECKING.
   The Hicks patent, No. 500.071, for a method of and means for cash registering and account checking, designed to prevent fraud and collusion by waiters and cashiers in hotels and restaurants, is void for lack of patentable novelty and invention.

Appeal from the Circuit Court of the United States for the Southern District of New York.

On appeal from a decree dismissing the bill in an action on letters patent No. 500,071, for an improvement in the art of cash-registering and account-checking, granted to John Tyler Hicks, June 20, 1893.

The opinion of the Circuit Court is reported in 155 Fed. 298.

Albert Francis Hager (Robert N. Kenyon and Richard Eyre, of counsel), for appellant.

Beattys & Lamb (George D. Beattys, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. The Hicks patent describes and claims a "method of and means for cash-registering and account-checking" designed to prevent frauds and peculation by waiters and cashiers in hotels and restaurants. The object of the alleged invention is accurately to check the account of the cashier and of each waiter. In carrying out the system, each waiter is provided with slips of paper, so marked as to distinguish them from those used by the other waiters in the same establishment. The person in charge of each department,

which fills an order given by waiters, is provided with a sheet of paper ruled lengthwise in parallel columns, each waiter having a particular column exclusively appropriated to him. Each waiter is numbered or otherwise marked. If numbered, and this is the simplest method of designation, the number on the slips given him will correspond with his own number and his orders will be entered in the sheet column bearing a similar number. For instance, waiter No. 6 is given a badge showing that number, which he is required to wear conspicuously; he is also given slips bearing that number and his orders are entered under column No. 6 by the person in charge of the department filling the orders. The large sheet on which the orders of the different waiters are entered is simply a sheet of plain paper with parallel lines ruled thereon, the columns being numbered at the top; a sheet of legal cap could easily be utilized for this purpose. Each waiter is given a number of slips about $3\frac{1}{2}$ by $5\frac{1}{2}$ inches in size, which are blank except that the waiter's number is marked thereon. If, for instance, waiter No. 6 receives an order for food, he goes to the kitchen department and when the order is filled he exhibits his tray to the checker, who enters the price of each article on the waiter's slip and also on his own sheet under the column No. 6. The slip is returned to the waiter, who presents it at the proper time to the customer. Either the waiter or the customer pays the amount to the cashier who retains the slip. It is usually sufficient in practice to enter the total of any one order and not each item separately. If subsequent orders are given either from the kitchen, the bar or the cigar stand, the same process is repeated and the amounts entered upon the same slip. At the close of business the sum of the slips of waiter No. 6 in the hands of the cashier, can easily be compared with the sum of the items charged to him by the departments collectively and the same is, of course, true of all the other waiters. The amount charged to all the waiters can be compared with the total of all the items of all the slips in the hands of the cashier and with the cash reported by the latter. If there has been no carelessness or dishonesty, the amounts will agree and if there has been, it is easy to discover where the fault lies.

The specification enumerates ten separate results, which it is alleged are accomplished by the use of the patented system, all having in view the protection of the employer from peculation by his servants either individually or in combination with each other.

The claims are as follows:

"1. The herein-described improved means for securing hotel or restaurant proprietors or others from losses by the peculations of waiters, cashiers or other employés, which consists of a sheet provided with separate spaces, having suitable headings, substantially as described, said headings being designatory of the several waiters to whom the several spaces on the sheet are individually appropriated, in conjunction with separate slips, each so marked as to indicate the waiter using it, whereby the selling price of all the articles sold may be entered in duplicate, once upon the slip of the waiter making the sale, and once upon his allotted space upon the main sheet, substantially as and for the purpose specified.

"2. The herein-described improvement in the art of securing hotel or restaurant proprietors and others from losses by the peculations of waiters, cashiers or other employés, which consists in providing separate slips for the waiters, each so marked as to indicate the waiter using it, and in entering upon the

slip belonging to each waiter the amount of each sale that he makes, and also in providing a main sheet having separate spaces for the different waiters and suitably marked to correspond with the numbers of the waiters and of their slips, and in entering upon said main sheet all the amounts marked upon the waiters' slips so that there may thus be a duplication of the entries, substantially in the manner and for the purpose specified."

The principal defense is lack of novelty and invention. Section 4886 of the Revised Statutes (U. S. Comp. St. 1901, p. 3382) provides, under certain conditions, that "any person who has invented or discovered any new and useful art, machine, manufacture or composition of matter" may obtain a patent therefor. It is manifest that the subject-matter of the claims is not a machine, manufacture or composition of matter. If within the language of the statute at all, it must be as a "new and useful art." One of the definitions given by Webster of the word "art" is as follows: "The employment of means to accomplish some desired end; the adaptation of things in the natural world to the uses of life; the application of knowledge or power to practical purposes." In the sense of the patent law, an art is not a mere abstraction. A system of transacting business disconnected from the means for carrying out the system is not, within the most liberal interpretation of the term, an art. Advice is not patentable. As this court said in Fowler v. City of New York, 121 Fed. 747, 58 C. C. A. 113:

"No mere abstraction, no idea, however brilliant, can be the subject of a patent irrespective of the means designed to give it effect."

It cannot be maintained that the physical means described by Hicks, —the sheet and the slips,—apart from the manner of their use, present any new and useful feature. A blank sheet of paper ruled vertically and numbered at the top cannot be the subject of a patent, and, if used in carrying out a method, it can impart no more novelty thereto, than the pen and ink which are also used. In other words, if the "art" described in the specification be old, the claims cannot be upheld because of novelty in the appliances used in carrying it out,—for the reason that there is no novelty.

The patent seems to us to cover simply a system of bookkeeping made applicable to the conditions existing in hotels and restaurants. The fundamental principle of the system is as old as the art of bookkeeping, i. e., charging the goods of the employer to the agent who takes them. Suppose the case of a firm selling goods by agents direct to the public. Before starting out the agent goes to each department and secures the goods needed by him, let us say, 5 dozen pairs of gloves, 3 dozen shirts, 100 neckties, 2 dozen pairs of shoes, etc. As a matter of course, the bookkeeper charges these items to the agent on the books of the firm and gives him a bill, or list, with the items and prices entered thereon. The agent knows from an examination of the list exactly what price he is to charge to the customer. When he makes remittances to the firm with statements showing the goods sold by him and the names of the buyers, the firm knows by an examination of its books what goods he has sold, how his sales compare with those of other agents and what amount, if any, he still owes. This, in essentials, is the scheme of the patent and it is as old as the laws of trade.

The patentee has modified and adapted it to fit the ephemeral character of the business in hand, but it required no exercise of the inventive faculties to do this. In a transaction which is to be concluded within an hour, a ponderous system of bookkeeping is unnecessary; but the substitution of a blank sheet laid on the desk for a blank sheet bound in a book, and a series of slips of uniform size for the ordinary bill heads, may require ingenuity and be more convenient, but it adds nothing of substance to the art.

The patentee is evidently an observant man, and, with large experience in the business, has written a treatise on restaurant account keeping, containing many valuable suggestions for preventing dishonesty by waiters, which may be epitomized as follows:—employ a competent and observant head waiter, have at least one honest man in charge, give each waiter a number and slips with a corresponding number, stamp the price of the articles ordered by him on the slip, and charge the amounts to him on a sheet of paper under his number, printed or written at the top of the sheet. Although the record does not show that this identical system was used prior to the patent, it does show that the underlying idea of keeping a duplicate record of the items taken by the waiter from the kitchen or bar, so that the cashier may know whether the proper amount of cash has been paid or not, had long been known. The essential features were old, the changes, elaborations and improvements of the patent belong to the evolution of the business of restaurant and hotel keeping, and would, we think, occur to any clever and ingenious person familiar with the needs of that business. The truth of this proposition will be made apparent by a brief survey of the prior art.

We agree with the judge of the Circuit Court in thinking that the patent to Smith for "a service and cash check," while not a direct anticipation, describes a system which in the main corresponds to that of the patent in suit. Smith says:

"The invention has for its object to assure returns to the proprietor to the full value of the food served by preventing collusion of employés and patrons without offense, and also to economize time of patrons and employés and assure more satisfactory service."

Smith provides each waiter with a package of checks requiring the waiter to write his name on the body and coupon of each check. As the waiter passes the checker on his way to the guest with the food ordered by him, the checker punches from the check the value of the food on the waiter's tray. When the order has been fully served, the cashier adds up the sums opposite the punch marks and writes the sum total in ink next the dollar mark on the check and coupon. The cashier has at hand a series of numbered spindles, one for each waiter, and on the proper one he places the coupon torn from the check. When a check is paid to the cashier, the coupon is returned to the waiter as a voucher and at the close of the day's business the cash in hand must correspond with the amount punched on the checks and also with the amounts written in ink on the coupons which are delivered up by the waiters when they have finished work for the day. The

Smith claim is not for a system, method or means, but is for "a service of cash check provided," etc.

Admitting, arguendo, that a system such as Hicks describes is patentable, if absolutely novel, we are of the opinion that the improvements of Hicks over the system disclosed in the Smith patent are such as would occur to anyone conversant with the business. The testimony also shows that several years prior to the Hicks application, there was in vogue in Harvey's restaurant in Washington, a system similar in all essential details to that of Hicks'. Although we are not prepared to say that the two systems are identical in detail, we are unable to discover any patentable improvements in the latter system over the former. We have no reason to discredit the statement of defendant's witnesses that Harvey used a checker's sheet ruled in parallel columns on which the prices of the articles ordered by the waiters, respectively, were entered, being also entered on the waiter's slip.

The brass check system which was in use prior to the patent is thus described in the complainant's brief:

"In this system the waiter received from the checker a brass check having thereon the total amount of the food, etc., served to the guest. If the guest gave a second order the waiter gave back the check to the checker and received a larger one in exchange. In some cases a record was made of the total paid by each guest, but this record was not like or comparable with the Hicks main sheet and could not achieve its results. There was no division of the sheet into spaces for the different waiters and there was no duplication of entries. The inadequacy of this system is obvious."

This statement is adopted because of its conciseness and, although it omits some features of the system, it will close debate upon the facts if it be accepted as correct. The principal differences between this system and the Hicks system are the substitution of paper for brass, recording each item separately instead of the total and using a recording sheet which is ruled instead of one that was not ruled.

Regarding the entry of the total amount upon the brass, or paper, check and upon the sheet, it will be remembered, as before stated, that the patentee says:

"Each item of the order may be entered separately on the slip and on the sheet if so desired, but, in practice, I have found it more convenient and usually sufficient for the purposes of my invention to enter the whole of any one order as a total."

This language is too plain to admit of doubt. It is a clear declaration on the part of the patentee that if the total be entered on the slip and sheet it will infringe the claims. This being so, if a system, similar in other respects, be found in the prior art where totals are so entered, it will anticipate the claims. The complainant has endeavored to explain away this statement but we are not in the least impressed by his efforts in that direction.

The alleged prior use by McKenna, we dismiss without comment for the reason that the testimony in its support is too uncertain to satisfy the requirements of the rule that prior use must be proved beyond a reasonable doubt.

If at the time of Hicks' application, there had been no system of bookkeeping of any kind in restaurants, we would be confronted with the question whether a new and useful system of cash-registering and account-checking is such an art as is patentable under the statute. This question seems never to have been decided by a controlling authority and its decision is not necessary now unless we find that Hicks has made a contribution to the art which is new and useful. We are decidedly of the opinion that he has not, the overwhelming weight of authority being that claims granted for such improvements as he has made are invalid for lack of patentability.

The case at bar is not distinguishable in principle, from the case of Hocke v. N. Y. Central & H. R. R. Co., 122 Fed. 467, 58 C. C. A. 627, in which this court, after describing the improvements "for securing against loss of freight" covered by the claims, said, "All this evidences good judgment upon the part of one who is experienced in the particular business, but it does not rise to the level of invention."

In the case of U. S. Credit System Co. v. American Credit Indem. Co., 59 Fed. 139, 8 C. C. A. 49, this court had before it a patent for "means for securing merchants and others from excessive losses by bad debts, which consist of a sheet provided with separate spaces and suitable headings," etc. The court says:

"There is nothing peculiar or novel in preparing a sheet of paper with headings generally appropriate to classes of facts to be recorded, and whatever peculiarity there may be about the headings in this case is a peculiarity resulting from the transactions themselves. * * * Given a series of transactions, there is no patentable novelty in recording them, where, as in this case, such record consists simply in setting down some of their details in an order or sequence common to each record."

It is unnecessary to multiply authorities as we are convinced that there is no patentable novelty either in the physical means employed or in the method described and claimed in the Hicks patent.

The decree is affirmed, with costs.